# STATE OF MICHIGAN

# COURT OF APPEALS

In re B. LYONS, Minor.

UNPUBLISHED
June 14, 2018

No. 340281
Marquette Circuit Court
Family Division
LC No. 16-010107-NA

In re L. LYONS, Minor.

No. 340451
Marquette Circuit Court
Family Division
LC No. 16-010107-NA

Before: O'CONNELL, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

In this consolidated appeal, respondent mother appeals by right two separate orders terminating her parental rights to BL (age two) and LL (age three).

Respondent voluntarily released her parental rights to BL in the midst of a termination hearing regarding both children. On August 21, 2017, Marquette Circuit Court Judge Cheryl Hill entered an order terminating parental rights after release. Respondent regrets that release. In Docket No. 340281, respondent argues that the trial court could not terminate her rights under the Adoption Code, MCL 710.21 *et seq.*, because BL's father did not similarly release his rights. Respondent further argues that the release was not knowing and voluntary because she made the release with the understanding that the trial court would not terminate her parental rights to LL based on how she treated BL. Finally, respondent argues that termination of parental rights was not in BL's best interests.

In Docket No. 340451, respondent appeals from a later September 13, 2017, order entered by Judge Hill, which terminated her parental rights to LL at the conclusion of a multi-day hearing. Respondent argues that case workers did not do enough to help her and, in fact, were so antagonistic to her that she had little hope of success. She maintains that the trial court erred in terminating her parental rights because the grounds for termination were not proven by clear and convincing evidence and because termination was not in LL's best interests.

-1-

Respondent further argues that the trial court failed to address certain conflicts of interests that call the fairness of the proceedings into question.

Finding no errors warranting reversal, we affirm both orders.

## I.  BASIC FACTS

Respondent was diagnosed with post-traumatic stress disorder, panic disorder, and borderline personality disorder.  In July 2016, respondent sent the following text message to BL's father:

> [D]o you want your kid to die? I am not going to feed him, I won't feed him change him nothing, I'm going to lock him in a room, I hope he suffocates, I stuck a blanket in his mouth, I am going to prison, I think [BL] is dead.

A jury trial was held in December 2016 and the court asserted jurisdiction over both children. The petition to terminate respondent's parental rights was filed on July 10, 2017 and a bench trial was held over the course of several days.  Respondent voluntarily released her rights to BL at the start of the termination hearing.  At trial, the focus was on respondent's mental health and her ability to effectively parent LL, the only child at issue.[1]  Testimony was particularly focused on two instances in which respondent's supervised visits were suspended due to her erratic behavior – once in December 2016 when respondent threatened to bring a gun to a visit and harm BL and another time in April 2017, when respondent went off on a tirade about BL, referring to him as a "football playing faggot."  Respondent was 22 years old at the time of the termination hearing. She had received services from Infant Mental Health, Early On, and Family Support Education. She also received counseling, a psychological evaluation, and numerous substance abuse evaluations.

The trial court concluded that, in spite of any progress respondent may have demonstrated, she was still unable to regulate her emotions.  It concluded that termination of respondent's parental rights to LL was in LL's best interests.

## II.  DOCKET NO. 340281

## A.  RELEASE UNDER THE ADOPTION CODE

On appeal, respondent argues that her release under the Adoption Code was invalid because the trial court did not also terminate the parental rights of BL's father.

Issues of statutory interpretation, such as the applicability of the Adoption Code, present questions of law that are reviewed de novo.  *In re RFF,* 242 Mich App 188, 195; 617 NW2d 745 (2000).

---

[1] LL's father released his parental rights to LL on October 18, 2016.

Respondent's position is contrary to the standard procedure that allows for instances in which a trial court may utilize provisions of *both* the Juvenile Code and the Adoption Code during the same proceedings.

The distinction is that under the Adoption Code, a parent voluntarily initiates proceedings while under the Juvenile Code, the state acts as the initiator. *In re Jackson,* 115 Mich App 40, 51; 320 NW2d 285 (1982). Although the Juvenile Code does not contain a provision governing the voluntary release of parental rights, a parent may consent to termination under the Juvenile Code by admitting that there exists a statutory basis for termination and that termination is in the best interests of the child. *In re Toler,* 193 Mich App 474, 477–478; 484 NW2d 672 (1992). Mere consent does not transfer the proceeding from the Juvenile Code to the Adoption Code, but there is nothing preventing a trial court from proceeding under the Adoption Code to accept a parent's release of parental rights. *Id.* at 478. During a child protective proceeding, a parent may voluntarily release his or her parental rights to a child pursuant to the Adoption Code. *In re Buckingham,* 141 Mich App 828, 836–837; 368 NW2d 888 (1985). Terminating parental rights under the Adoption Code involves "a completely separate statutory proceeding from a termination under the Juvenile Code." *In re Jones,* 286 Mich App 126, 128; 777 NW2d 728 (2009). Under the Adoption Code, a release of parental rights shall not be executed until certain circumstances are met, including a full explanation to the parent or guardian of the legal rights of the parent or guardian and the fact that those rights would be permanently relinquished. MCL 710.29(6). There are, however, no similar established rules governing consent to termination under the Juvenile Code. The procedure utilized by the trial court in this case is exactly what this Court has recommended. Clearly, the Adoption Code contemplates a scenario when only one parent releases parental rights to a child. There was no error.

## B. VALIDITY OF RESPONDENT'S RELEASE

Respondent next argues that her release was not knowingly and voluntarily made because it was the result of bad legal advice. Respondent's attorney allegedly assured respondent that if she released her rights to BL, then her interaction with him could not be used in the termination proceeding involving LL.

This Court reviews de novo the issue of the validity of a release of parental rights. *In re Buckingham,* 141 Mich App 828, 836–837; 368 NW2d 888 (1985). However, this Court reviews a trial court's decision to accept or reject a parental release of rights under the Adoption Code for an abuse of discretion. *In re Blankenship,* 165 Mich App 706, 712; 418 NW2d 919 (1988). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *In re MKK,* 286 Mich App 546, 564; 781 NW2d 132 (2009).

A release must comply with the Adoption Code, which provides the following:

> A release by a parent or a guardian of the child shall not be executed until after the investigation the court considers proper and until after the judge, referee, or other individual authorized in subsection (2) has fully explained to the parent or guardian the legal rights of the parent or guardian and the fact that the parent or guardian by virtue of the release voluntarily relinquishes permanently his or her rights to the child; and, if the child is over 5 years of age, the court has determined

that the child is best served by the release. [MCL 710.29(7); see also *In re Burns,* 236 Mich App 291, 292; 599 NW2d 783 (1999).]

In other words, such a release must be "knowingly and voluntarily made." *Burns,* 236 Mich App at 292.

Before proofs were taken at the termination hearing, the trial court recessed and conducted a hearing under the Adoption Code to facilitate respondent's release of parental rights. The trial court took painstaking care to ensure that respondent understood what was happening. Respondent understood that she would no longer have a say in any of the day-to-day parenting decisions regarding BL:

I've come to the conclusion that even if I did not get my rights terminated, when it comes to [BL], that I would really have no say in those decisions either, just because I have talked with my lawyers. I would not probably – I would probably see him every other week, and I don't think that that is sufficient enough to put my morals into him.

She later added:

Did – did I want and [sic] abortion with [BL]? Yes, I did. But, after I had him, did I want him? Yes. I was at the prenatal unit up there every single day for hours while I had my son [LL]. I do not feel that I was given the proper time to bond with my son. I think that I got postpartum quickly after I had had my son, and this kinda just snowballed. I mean, I never had panic attacks like I have now in my visits before this happened. I would literally just sit home, cry in my bed, and shake. You know, hyperventilate a little bit, but I never acted like that when I had, you know, beforehand. And, I think that I was court ordered to have visits with my child that it's not that I disagree to them, it's I had said, "I can't do them while I'm working," and I had asked several times that I have proof of, if I could have visits with [BL]. And I think that a lot of what's happened with [BL] has to do with the fact that I haven't been able to bond. It's not like I haven't wanted to, because I – I've asked several times, you know, and I think that they really put me in a bad situation where I couldn't bond with [BL], and now I'm just at the point where I kinda wanna just bury that memory, because, I mean, I was never able to bond with my child. I mean, do I wish that I could have a bond with him? Of course. But, I don't think that I was sufficiently able to.

The trial court ensured that respondent had not been promised anything in exchange for her release. Respondent indicated that BL's father had promised she could see BL if she was doing well, but that was not the reason for her decision. Respondent asked the trial court the following question: "If I have a kid later in life in Michigan, does that mean it's gonna get taken away?" The court advised:

Well, what it means is that there will be a record of, first of all, the CPS case and the NA case. That means neglect and abuse. And, there is a system that the Michigan Department of Health and Human Services has an – and if there is

some concern about a child that you have in the future, they will get all of the history. And, yes, they will know that you have released one of the children. And, that is one factor that they will look at – at when – as far as trying to remove a child from you. That's not the only factor they would look at, though. Will it be more likely for you than for someone who's never had a termination?

A review of the record reveals that the trial court investigated whether respondent understood that she was giving up the rights to BL, whether she had sufficient time to consider her decision, and whether her decision was coerced in any way. Therefore, the trial court did not err in determining that respondent's releases were knowingly and voluntarily made. Even if a parent was "in a state of emotional turmoil at the time of relinquishment," the decision is still deemed to have been given "freely and knowingly" if there is no evidence that the parent's "ability to make an informed, voluntary decision was ever impaired." *In re Blankenship,* 165 Mich App at 712. Moreover, when "the consequences and final nature" of a parent's decision had been explained to the parent, there is no reason to believe that the parent's release is anything but freely and knowingly given. *Id.* Therefore, the record fully supports that respondent's decision was given freely and knowingly.

Respondent argues that she received ineffective assistance of counsel because counsel wrongfully advised her that her voluntary release of parental rights as to BL would mean that none of the information regarding her relationship with BL would be used against her in the termination hearing as to LL. However, it is well established that there is no right to appointed counsel in a voluntary adoption matter. *In re Blankenship*, 165 Mich App 706, 713; 418 NW2d 919 (1988). Even if respondent was given incorrect legal advice by her trial attorney about the import of voluntarily releasing her parental rights to BL as to the effort to terminate her parental rights to LL, that would not make her decision to release rights to BL involuntary. Rather, respondent voluntarily released her rights to BL in an effort to avoid termination of her parental rights to LL. That is hardly a truly involuntary decision. Additionally, her willingness to so sacrifice her parental rights to BL would certainly be a strong indication that she is not sufficiently concerned with remaining his legal parent that setting aside her release of parental rights to him would be in his best interest. Respondent made abhorrent statements indicating a lack of desire to see BL and extreme hostility toward him at a monitored parenting time visit with LL. She fully admitted that she was not bonded to BL.

C. BL'S BEST INTERESTS

Finally, respondent concedes that under MCL 710.59(6), the trial court was not required to determine whether the release was in BL's best interests because he was under the age of five. She appears to argue that, in taking the additional step of concluding that the release was in BL's best interests, the trial court was compelled to go over each individual factor, including the fact that BL was placed with his father. The trial court's additional finding did not expand its obligation under the Adoption Code.

On this record, there is no question that the release in BL's case was under the Adoption Code and that such a release is proper and valid, even if the other parent's parental rights remain intact. Additionally, the trial court carefully ensured that respondent's release was knowingly and voluntarily made. Because the release proceeded under the Adoption Code, respondent

cannot claim ineffective assistance of counsel. In any event, even if she was given faulty legal advice, it did not negate the voluntary nature of her release. The trial court did not err in considering the various best interest factors when accepting the release because BL was under five years old.

## III. DOCKET NO. 340451

### A. BIAS AGAINST RESPONDENT

Respondent argues that she was set up for failure because of petitioner's unreasonable expectations and bias against her. Respondent believes that petitioner created the conditions that it later claimed needed to be rectified before reunification could occur.

Whether child protective proceedings comply with a parent's right to due process is a question of constitutional law that is reviewed de novo. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009); *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). However, "[a]n unpreserved claim of constitutional error is reviewed for plain error affecting substantial rights." *Williams*, 286 Mich App at 274.

Respondent argues that petitioner cannot deliberately create the conditions that it later claims need to be rectified before reunification can occur. Respondent claims that she was forced to work with someone she did not trust and who wanted her to fail. The trial court acknowledged that respondent and case worker Teresa Luedeman had a difficult working relationship – "The Court believes that this personality clash was evident and played a small role in the case." However, respondent's arguments do not withstand a review of the record.

She claims that petitioner contrived a substance abuse problem, which resulted in three different substance abuse evaluations. But the substance abuse assessments were the result of respondent's psychological assessment. It was Dr. Dorothy Kahler who recommended that respondent undergo a substance abuse evaluation based on respondent's statement that she would drink to blacking out. Respondent was involved in a number of instances that raised the possibility that she had a substance abuse problem, including an arrest for disorderly conduct in November 2016 and alleged footage from February 2017 where respondent appeared to be intoxicated. Respondent fails to demonstrate how these substance abuse evaluations worked against her and, more importantly, fails to show how it was vindictive on the part of case workers.

Respondent also blames petitioner for her loss of parenting time when respondent failed to seek dialectal behavior therapy (DBT) at Pathways when she was already receiving that service through Marquette Hospital. But respondent's DBT therapist at Marquette Hospital, Mindy Flanigan, acknowledged that the Pathways program was different from the one offered at Marquette. The Pathways program had a psychiatrist available on a regular basis and also had phone coaching and individual therapy. Respondent seems to argue that the programs were interchangeable and that petitioner was simply using it as an excuse to deprive respondent of parenting. But the programs are not the same and respondent fails to demonstrate that it was unreasonable of petitioner to require respondent to attend Pathways before resuming parenting time.

Primarily, respondent claims that petitioner placed her in situations that aggravated her mental health issues. Specifically, she complains that the visits occurred in a small room, which caused her to feel trapped and claustrophobic. Respondent believes that petitioner knew she was doomed to fail in that environment. Respondent fails to accept responsibility for her role in disrupting parenting time. She complains that she lacked support and felt like everyone was against her, but she liked Family Support Education worker Stacy Forejt, who was at the failed April 21, 2017 visit. Even with support in place, respondent was unable to control her impulsivity.

In short, the record does not support respondent's claim that she was set up for failure because of bias against her.

### B. REASONABLE EFFORTS

Respondent argues that petitioner failed to provide her with reasonable efforts to reunify the family. She believes petitioner should have offered trauma counseling following the alleged sexual assault, anger management classes, counseling for post-partum depression, alcohol or drug related services, and workers who would not thwart respondent's ability to get her parenting time back.

"In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). An appellate court reviews the trial court's findings regarding reasonable efforts for clear error. *In re Fried*, 266 Mich App at 542-543. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

The trial court believed that petitioner made reasonable efforts to rectify the conditions leading to adjudication, which included: Infant Mental Health Services; Early On; Family Support Educator; supervised parenting time; a psychological evaluation; drug screens; and individual counseling. The trial court also acknowledged that respondent sought many services on her own. Still, "[t]he fact that respondent sought treatment independently in no way compels the conclusion that petitioner's efforts toward reunification were not reasonable, and, more to the point, does not suggest that respondent would have fared better if the worker had offered those additional services to him." *In re Fried*, 266 Mich App at 543. The trial court concluded:

> This court finds that reasonable efforts were made to preserve and unify the family to make it possible for the child to safely return to the home. Ms. Lyons was afforded all services she requested during the case. Her requests of sexual assault counseling and NA/AA came at the termination trial. She was afforded services to help deal with her emotional instability as well as her lack of parenting skills. Those efforts were, however, unsuccessful.

The trial court noted that "The evidence does not support a finding that Ms. Lyons would have fared better had additional services been offered or had she been given additional time or

changes before filing of the termination petition." The trial court did not clearly err when it concluded that petitioner provided reasonable services toward reunification.

## C. STATUTORY BASES FOR TERMINATION

Respondent argues that petitioner failed to prove that a statutory basis existed to terminate her parental rights.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). An appellate court "review[s] for clear error [] the court's decision that a ground for termination has been proven by clear and convincing evidence . . . ." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), abrogated by statute on other grounds as stated in *In re Moss*, 301 Mich App 76; 836 NW2d 182 (2013). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Respondent's parental rights were terminated pursuant to MCL 712A.19b(3)(c)(*i*) and (g), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (i) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The trial court first considered MCL 712A.19b(3)(g) and whether respondent would be able to provide LL proper care and custody within a reasonable time. The trial court noted that the experts agreed respondent would need an additional year of services, at a minimum, and would need to be fully committed to change. However, "[h]er actions do not indicate she is fully committed to change. Her recent text messages are an example of her failure to commit." The trial court pointed to the fact that even respondent's therapist, Linda Dunbar, did not believe that

-8-

respondent was safe to be with LL in an unsupervised setting and that Dunbar could not offer an opinion as to how long it would take respondent to successfully parent. The DBT therapist, Mindy Flanigan, likewise opined that it would take respondent a minimum of a year to integrate her heart and mind. The trial court added that it had witnessed a number of emotional outbursts from respondent throughout the proceedings and that respondent often left the courtroom during the termination proceeding. In concluding that respondent continued to struggle with emotional regulation, the trial court noted the domestic violence incident between respondent and her father and the fact that respondent's visits were twice suspended due to her being deemed a risk of harm to the children. The trial court concluded that termination was appropriate pursuant to subsection (3)(g):

> The facts are clear that in the time the child has been in care, Ms. Lyons has failed to progress beyond supervised visits. This clearly indicates that she will be unable to provide the proper care and custody within a reasonable time. She has been given ample time to demonstrate that her child would be safe and secure in her care for unsupervised visits, yet she has failed to convince the service providers or the Court of the same. Visitation with Ms. Lyons and her child continues to be identified as loud, chaotic, and neglectful.

> Ms. Lyons was unable to complete the Infant Mental Health program. Ashley Finn, the Infant Mental Health Specialist that worked with Ms. Lyons, stated that she was unsuccessfully discharged and did not find that [t]here was a bond between Ms. Lyons and her son.

> The Court does not feel that an additional year – for a total of two years is a reasonable amount of time to make [LL] wait. There is no guarantee that if the case remained open for an additional year that Ms. Lyons would be successful. According to the professionals, Ms. Lyons would have to work very hard to make progress. She has made some progress, however, the fact is that as recent as three weeks before the termination trial, when she knew the trial was scheduled, Ms. Lyons engaged in some very disturbing texts with the foster mother. Ms. Lyons asked the foster mother to destroy photos that made [LL] happy. She clearly continues to demonstrate that she has yet to understand and see her child's needs before her own. Ms. Lyons did not seem to comprehend that the things she said and did while around her child had any effect on the child. Ms. Lyons does not see her child's needs as important. Ms. Lyons appears to treat [LL] as a need gratifying object.

The trial court then turned its attention to MCL 712A.19b(3)(c)(*i*) to determine whether the conditions leading to adjudication continued to exist and whether there was a reasonable likelihood that the conditions would be rectified in a reasonable time. After determining that well over 182 days had lapsed between disposition and termination, the trial court added:

> This Court cannot find that meaningful change has been made. Ms. Lyons continued to demonstrate dysregulated emotions and an inability to put her child's needs first. On April 21, 2017 during parenting time, Ms. Lyons said in front of [LL] "I don't want to see [BL] ever again"; "[BL] is a football loving faggot"; "I

-9-

don't want to be here"; and that "she would not ever talk to [LL] again if he was gay." She told [LL] his brother . . .is your sister and a faggot; and that "she would rather be shot by a black dude in Chicago, than be with [BL]." At the time of trial, Ms. Lyons admitted she stated all of these things. She however did not find swearing to be a bad thing in front of children. She tried to downplay her statements at the time of trial by saying she did not mean them, however once the bell is wrung it is impossible to un-ring. When Kayla Lyons feels like she is being threatened she will lash out at anyone around her – including her children. She also failed to protect [LL] from self-harm at the visit and allowed him to slip off of the couch. Ms. Lyons was too involved in her own fight or flight reaction that she could not and did not attend to her child.

The trial court's findings on the statutory bases are supported by the record and not clearly erroneous.

## D. LL'S BEST INTERESTS

Respondent argues that, even if a statutory basis was proven by clear and convincing evidence, termination was inappropriate because it was not in LL's best interests. Respondent benefitted from services and made substantial progress.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. An appellate court reviews a trial court's best interests determination for clear error. *Trejo*, 462 Mich at 356-357; *Olive/Metts*, 297 Mich App at 40.

The trial court addressed whether termination of respondent's parental rights was in LL's best interests:

In this case, at the time of termination, [LL] was approximately 2 years old and he had spent 13 months in foster care. The Court is of the firm belief that [LL] is in need of permanence and stability. Kayla Lyons is unable to provide that permanence and stability because, despite efforts to reunification Ms. Lyons has substantially failed to benefit from important services designed to address her barriers to reunification and it is unlikely that [LL] could be returned to his mother within the foreseeable future, if at all. . . . Given Ms. Lyons' inability to regulate her emotions at supervised parenting time and put her child's needs before her own needs, [LL] would be placed at risk of harm if returned to his mother's care. Moreover, according to the Infant Mental Health worker, there was essentially no bond between mother and [LL]. Ms. Lyons went substantial periods of time without seeing [LL]. It is true some of the periods were imposed by the Court but this was done for the safety of the child. Threats of guns being brought to visits and failure to attend to a child's need (i.e. keeping him from banging his head on the wall, or pushing him away so that he slides off the couch) at parenting

time were real and substantial threats to [LL's] safety which necessitated cessation of parenting time by the Court.

[LL] was placed in a loving foster home where all of his needs were being met. [LL] no longer exhibits self-injurious behaviors such as head banging. He no longer has tantrums that last 30 minutes to an hour. He is doing "phenomenally" well according to the foster mother. In these circumstances, it is reasonable for this Court to conclude that the bond of biology is displaced by the bond of nurturance in the foster home.

[LL's] foster parent has also expressed a desire to provide [LL] with a stable home for as long as necessary and if that meant adoption she would adopt [LL]. The Court finds that [LL's] best interests cannot be served by subjecting him to reunification efforts with Ms. Lyons, when clearly Mrs. [sic] Lyons has not demonstrated any consistency in effective parenting. [LL] is much better off in his foster care. [LL] deserves permanency, stability, and finality.

He has made positive steps forward in growth and development, and this court sees no reason to place him in jeopardy by ordering reunification efforts with Ms. Lyons. Termination of Kayla Lyons's parental rights to [LL] is in the best interest of the child.

At the best-interest stage, the focus is on the child and not the parent. *In re Moss*, 301 Mich App at 87. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). A court may also consider the length of time that the minor child was in foster care or placed with relatives and the likelihood that the child could be returned to the parents' home within the foreseeable future. *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). Again, the record supports the trial court's findings and there is no clear error.

## E. CONFLICTS OF INTEREST

Finally, respondent argues that the trial court failed to address numerous conflicts of interests. Robert Juidici, who was LL's GAL, represented respondent's father in a neglect proceeding in which respondent was the child. Juidici opposed respondent's request that LL be placed with her father. Dianne Heitmann was an assistant prosecuting attorney and had represented respondent's mother in the previous neglect case. Mary Lou Striser represented LL's biological father and had previously represented respondent as GAL in the neglect proceeding in which respondent was the named minor. Respondent writes:

There were multiple obvious conflicts of interest between the parties in this case; however, after concerns were raised, no action was taken. The court wrongfully terminated Ms. Lyon's parental rights given the absurd conflict of interests that existed. A fair proceeding could not have possibly taken place. It is questionable

whether Ms. Lyons was ever treated fairly throughout any part of the entire proceeding.

This issue is not adequately briefed and need not be addressed. Respondent cites no law supporting her position. Nor does she set forth how – assuming any conflicts existed – those conflicts impacted the proceedings.

It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. [*Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).]

Affirmed.

/s/ Peter D. O'Connell
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan